**Marcie M. McCARTHY, Appellant,**

v.

**WANI VENTURE, A.S., Successor in Interest to Norgips USA, Inc., Appellee.**

No. 01–04–00921–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 28, 2007.

Rehearing Overruled Aug. 30, 2007.

---

S. Gary Werley, Fort Worth, for Appellant.

Leslie C. Taylor, Zimmerman, Axelrad, Meyer, Stern & Wise, P.C., Houston, for Appellee.

Panel consists of Justices JENNINGS, HANKS, and HIGLEY.

## OPINION

GEORGE C. HANKS, JR., Justice.

Appellee, Wani Venture, A.S., successor in interest to Norgips USA, Inc. (collectively "Norgips") filed a suit on a sworn account against several defendants, alleging of fraud and seeking to pierce the corporate veil. As of the time of trial, all of the original defendants had filed bankruptcy, had been severed out of the case, or had been non-suited, with the exception of appellant, Marcie McCarthy. Following a jury trial, the trial court rendered judgment against McCarthy for $669,957.

In six issues, McCarthy argues that (1) the trial court erred in submitting an incorrect definition of "actual fraud" in the jury charge; (2) there is no evidence that her company, Triple M Supply LLC, committed an actual fraud; (3) there is no evidence to support the damages and attorney's fees award; (4) there is no evidence or insufficient evidence that McCarthy caused Triple M Supply to be used to perpetrate an actual fraud and did perpetrate an actual fraud upon Norgips, primarily for her own direct personal benefit; and (5) the trial court erred in finding McCarthy individually liable for the amounts that the jury found that Triple M Supply owed Norgips. We affirm.

## Background

### Triple M Supply's Purchase Order

Norgips, a Florida corporation, manufactures and sells wallboard, also known as drywall or sheetrock. John Kingston, Norgips's president, testified that, in 2000, there was a severe shortage of wallboard in the marketplace, and "people were scrambling to try to find drywall any place in the world that they could in order to supply the U.S. production." Kingston hired Steven Klubak to be Norgips's general manager and to monitor the Texas and Florida markets. Kingston explained that part of the reason that he hired Klubak was because Klubak told him that "he had this customer in Texas that was a big player that could help [Norgips] be a major factor in the Texas market." The "big player" was Triple M Supply, LLC.

Triple M Supply was a wallboard distributor owned, in three equal parts, by Anthony Moschella, Michael Moschella (Anthony's brother), and Marcie McCarthy (Michael's girlfriend). Triple M Supply completed Norgips's confidential credit application, and it was agreed that Triple M Supply would be Norgips's sole distributor in the east Texas market. Triple M Supply prepared a purchase order for Norgips to ship approximately $1.8 milion of wallboard from Poland to the Port of Houston. Once the shipment arrived, it was stored in a warehouse in the Port of Houston, and Norgips would deliver the wallboard incrementally, in response to individual invoices from Triple M Supply. Kingston testified that it was Norgips's intention to hold Triple M Supply liable for the full amount of the purchase order. The first delivery was placed in April 2000. Triple M Supply was slow in making payments and, in October 2000, its $108,000 check was returned for insufficient funds. Kingston testified that, after the check bounced, "the red flag went up and we started having serious concerns as to whether or not we were going to get the money that was due to us." Kingston testified that there was "constant communication" between Klubak and Anthony Moschella regarding Norgips's outstanding bills. After Norgips received a $66,000 check from Triple M Supply in late October—$42,000 less than the amount owed from the bounced check,

Kingston asked Klubak to meet with Triple M Supply to review its accounts receivables. Kingston wanted Klubak to determine what payments were due to Triple M Supply from its customers and to explore the likelihood of whether it could satisfy its debt to Norgips.

In December 2000, Anthony Moschella provided Klubak with bookkeeping records of Triple M Supply's accounts receivables.[1] From these records, Kingston discovered that there were outstanding receivables for more than $500,000. He saw that Triple M Supply's largest customer was JTMM Construction Company.[2] Based on his review of these records, Kingston learned that Anthony Moschella, Michael Moschella, and Marcie McCarthy had another business, Triple M Operating. Triple M Supply had apparently stopped "invoicing" customers in July 2000, and Triple M Operating had begun invoicing the customers who purchased Norgips's wallboard. Kingston testified that he was alarmed to discover that "the people that we had our contractual relationship with, Triple M Supply, was no longer distributing our board." Instead, Triple M Operating was distributing the board. From the accounting records provided to Norgips, there appeared to be no distinction between the various companies. Kingston testified that this discovery "immediately raised a flag" because it seemed as though Triple M Supply, which "owed a lot of money to a lot of people," was setting up new corporations in order to continue doing business. Kingston was concerned because handwritten notes on the accounts receivables records led him to believe that these were old debts that were not going to be paid. Kingston also discovered that, during the time that it was Norgips's exclusive distributor, Triple M Supply was actually selling a competitor's board, while Norgips's board sat in the warehouse.

In January 2001, Kingston and Klubak met with Anthony and Michael Moschella in an attempt to determine whether Norgips was ever going to be paid. Anthony Moschella again provided a copy of Triple M Supply's bookkeeping records of its accounts receivables.[3] This second set of records showed that, in the month since the previous accounts receivables records had been provided to Norgips, Triple M Supply had collected more than $50,000—none of which had been used to pay the outstanding balance it owed to Norgips. Kingston testified that Anthony Moschella reassured him and explained that "he had $470,000 of good receivables there that he would expect to receive payment on." Anthony Moschella "pledged" the receivables to Norgips. At that point, Triple M Supply owed Norgips $504,000. Kingston was surprised to learn from Anthony Moschella at the meeting, however, that Triple M Supply had collected $150,000 from sales of Norgips's wallboard but had diverted those funds to Mexico to another of Anthony Moschella's business ventures.

Within a week of the meeting, a $71,170.87 check made out to Norgips from Triple M Supply was returned for insufficient funds. Norgips's last delivery of

1. These accounting records were admitted into evidence with the limiting instruction that they were not offered to prove the truth of the information contained therein, but simply to show what Anthony Moschella had provided the records to Norgips at the meeting.

2. Anthony Moschella owned 90 percent of JTMM, and his parents owned the remaining 10 percent.

3. The same evidentiary restriction was placed on the jury's consideration of this second set of records-accounts receivables-they were not admitted to prove the truth of the information contained therein.

wallboard to Triple M Supply occurred in December 2000. Kingston testified that Norgips sold $1,047,000 of wallboard to Triple M Supply. However, Triple M Supply had paid Norgips only $504,800, and still owed Norgips $541,850.

In February 2001, Kingston was contacted by Leeland Dykes, a stock broker. Dykes explained that he had hired a private detective and had learned that Norgips was owed a lot of money by Triple M Supply. Kingston flew to Houston to meet with Dykes, and he was told that Klubak, who still worked for Norgips, and Anthony Moschella had been trying to corner the wallboard market and drive up the price so that they could sell it at a premium. Kingston learned that Klubak had been brokering other companies' wallboard and had sold more than $500,000 of wallboard from Shamrock, a Norgips competitor, while he was Norgips's general manager. Kingston was told that Shamrock had been "stiffed" for $105,000 and had obtained a judgment against Klubak for that amount. As soon as he returned from his meeting with Dykes, Kingston fired Klubak. Shortly thereafter, Kingston discovered that there were three UCC filings reflecting that all of the assets of Triple M Supply, Triple M Operating, and JTMM had been pledged to creditors other than Norgips. These pledges were contrary to Anthony Moschella's representations that the receivables were pledged to Norgips and that he would formalize the assignment with a creditor's lien.

### Behind the Scenes

The jury was presented with testimony and evidence at trial regarding several interrelated companies involved in this case, which were generally owned by the same people. Based on our review of the record, this evidence may be summarized as follows:

| Full Name | Funded | Ownership |
|---|---|---|
| Caribe Forest Products, Inc. ("Caribe") | (record is silent) McCarthy non passive investor | Marcie McCarthy, President Michael Moschella, Secretary/Treasurer |

| | | |
|---|---|---|
| Caribe Forest Products, I, Ltd. ("Caribe I") | (record is silent) | Marcie McCarthy, President Michael Moschella, Secretary/Treasurer |
| JTM Supply | McCarthy invested $176,000 | d/b/a JTMM |
| JTMM Construction, Inc. ("JTMM") | McCarthy invested $150,000 + $215,000 two months later | 90% Anthony Moschella 5% Mando Moschella 5% E. Moschella |
| K Cor Supply, LLC ("K Cor") | (record is silent) | 100% Anthony Moschella |
| M Global Shipping, LLC ("M Global") | (record is silent) McCarthy non passive investor | 33.34 % Marcie McCarthy 33.33% Anthony Moschella 33.33% Michael Moschella |
| Triple M Operating, Ltd. | opened with $600,000 loan from Isle of Man; McCarthy non passive investor | 33.34 % Marcie McCarthy 33.33% Anthony Moschella 33.33% Michael Moschella |
| Triple M Supply, LLC | McCarthy invested $391,000; McCarthy is non passive investor | 33.34 % Marcie McCarthy 33.33% Anthony Moschella 33.33% Michael Moschella |
| WoodPal, Ltd. ("WoodPal Ltd.") | Anthony Moschella testified that McCarthy invested $391,000; McCarthy is non passive investor | 33.34 % Marcie McCarthy 33.33% Anthony Moschella 33.33% Michael Moschella |

| | | |
|---|---|---|
| WoodPal de Mexico ("WoodPal Mexico") | McCarthy testified that her $391,000 was transferred from Triple M Supply to Tijuana to form WoodPal Mexico | Mexican entity |
| WoodPal USA, Inc. ("WoodPal USA") | (record is silent) | Anthony Moschella has a majority interest |

The evidence presented to the jury established that the corporate entities were interrelated, and their history was, at times, complex. With the exception of JTMM, each of these entities was created in the years 1999 through 2001, the same time period that Norgips was supplying Triple M Supply with wallboard. With the exception of Caribe and Caribe I, the entities all shared the same 1000 square foot office space, telephone system, and computer.

## Caribe

The evidence indicated that Caribe, the general partner of Caribe I, was formed and funded with $150,000 from McCarthy in November 2000 to distribute mulch. McCarthy was a non passive investor of Caribe in 2001.[4] At the time of trial, McCarthy and Michael Moschella still worked together on this enterprise. Although no partnership agreement was executed, McCarthy and Michael Moschella each owned equal shares, with McCarthy serving as president and limited partner. McCarthy's trial counsel was the initial director of Caribe.

## Caribe I

Certificate of Limited Partnership was filed on January 30, 2001. Caribe is the general partner, and McCarthy and Michael Moschella are limited partners.

## JTM

JTM was doing business as JTMM. On August 17, 1999, $543,105 of inventory was transferred to the books of Triple M Supply with no evidence of consideration.

## JTMM

JTMM was formed in 1995 to install drywall. McCarthy claimed to have no involvement in JTMM, but received $15,000 in "officer draws" and a $2,688 reimbursement for travel. Anthony Moschella owned 90 percent of JTMM, and his parents owned the remaining 10 percent. In 1999, after reviewing the financial statements and the collateral involved, McCarthy hired an attorney to draw up the paperwork so that she could loan JTMM $150,000. During 1999 to 2000, she received almost $26,000 in interest payments on her loan. McCarthy testified that $50,000 of the original loan was never repaid. Based on his review of the accounts receivable records, Kingston learned that JTMM owed Triple M Supply $120,000.

## K Cor

Anthony Moschella, as sole owner, formed K Cor in 1999 to stock wallboard in houses. Triple M Supply was K Cor's biggest customer. K Cor would pick up the wallboard and deliver it to a home. Anthony Moschella testified that K Cor stopped operating in mid–2000 because "[i]t was not worth the hassle to do the work and tend to the people." K Cor was still in existence, but did not do any business.

## M Global

M Global was formed in December 1999 with McCarthy as president and McCarthy was a non passive investor for 2000 and 2001. It was formed to hire a ship for one shipment of wallboard for Triple M Supply. There is no proof that the shipment ever took place, but McCarthy explained that "Michael handled all that stuff." When asked, McCarthy testified that she did not find it curious that a company had to be formed to do something for Triple M Supply that Triple M Supply could have done on its own.

---

**4.** McCarthy represented on her personal tax returns that she was a "non-passive" investor in various business entities alleged to have been involved in the fraud against Norgips. To be classified as a "non-passive" investor, a person must represent to the Internal Revenue Service, among other things, that they spent more than 500 hours working in the business during the tax year.

## Triple M Operating

Triple M Operating was formed in March 2000 to distribute wallboard. The Moschellas and McCarthy also owned Triple M Operating in one-third shares. McCarthy testified that, despite being 1/3 owner, she was unaware of Triple M Operating's existence until the filing of this lawsuit. Even after discovering the entity's existence, she made no inquiries about it. McCarthy was a non passive investor in 2000.

Triple M Operating took out a $600,000 loan from Associated Enterprises Limited just two days before the shipment from Norgips cleared U.S. Customs and was delivered to Triple M Supply. Anthony Moschella testified that $391,000 of the $600,000 was used to reimburse McCarthy for the money that she had loaned Triple M Supply. He further testified that part of the remaining $209,000 was used to pay off some of Triple M Supply's debts. Triple M Operating sold some of the Norgips board that belonged to Triple M Supply. All of Triple M Operating's accounts receivables were pledged to Associated Enterprises.

Triple M Operating filed for bankruptcy protection on September 16, 2002. Its petition listed Associated Enterprises as a $600,000 creditor and Norgips as a $500,000 disputed creditor.

## Triple M Supply

Triple M Supply was formed in July 1999 as a wallboard distributor and was owned in one-third shares by Anthony Moschella, Michael Moschella, and Marcie McCarthy. Anthony Moschella was principally in charge and held the position of president. McCarthy was vice-president, and Michael Moschella was secretary-treasurer. McCarthy put $391,000 into Triple M Supply and she was a non passive investor in 1999, 2000, and 2001. Her testimony changed from understanding that her *investment* would be lost if Triple M Supply did not survive in contrast to her same-day testimony that she was entitled to interest on the $391,000 *loan* that she gave Triple M Supply. Michael Moschella invested $75,000 in Triple M Supply.

Michael Moschella testified that McCarthy was "actively involved" in the operations of Triple M Supply and "very organized" until late 1999 or early 2000. McCarthy received officer's draws, salary, and health insurance as compensation from Triple M Supply. In 2000 and 2001, she filed tax returns reflecting a non-passive involvement in Triple M Supply. JTMM was Triple M Supply's largest customer.

McCarthy was, at one time, making $1,000/week from Triple M Supply. She testified that she questioned "why one company was paying interest that another company owed the debt on." She would receive her interest payment for the loans to JTMM and Triple M Supply in one check. Triple M Supply was paying JTMM's debts. Despite being morally concerned by Anthony Moschella's conduct, McCarthy testified that she stayed on as an officer and director until Triple M Supply went out of business. She admitted that she had check-writing privileges, but never went to the bank to look at the financial status of the company. She believed that "what you don't see can't hurt you."

Leeland Dykes testified that he introduced some investors, the Fabrianos, to the Moschellas. The Fabrianos invested $150,000 in Triple M Supply and got a quick return on their money. They then reinvested their money with the interest that they had earned, and it "disappeared." [5]

5. Dykes testified that the Fabrianos sued him, and he was found liable for their $150,000 investment.

Triple M Supply pledged its debts to Mid American Capital Resource Group without any evidence of consideration.

## WoodPal Ltd.

WoodPal Ltd. was formed in June 2000 as a limited partnership. Its general partner is WoodPal Materials, Inc. Anthony Moschella testified that he owned the majority shares and that McCarthy and Michael Moschella were the limited partners. Anthony testified that WoodPal Ltd. was more active than WoodPal USA. Anthony Moschella testified that WoodPal was funded by $391,000 of the $600,000 loan McCarthy made to Triple M Operating. McCarthy was not reimbursed, and she has no proof that her money was actually transferred to WoodPal. Anthony testified that the money came to WoodPal Ltd. after McCarthy had been reimbursed for the $391,000 that she had loaned to Triple M Supply. WoodPal filed for bankruptcy in September 2001 and listed Norgips as a "disputed" creditor that was due $500,000.[6] McCarthy was a non passive investor in 2000.

## WoodPal Mexico

McCarthy testified that WoodPal Mexico was a Mexican entity that imported lumber from Chile to make pallets in Mexico. On January 10, 2000, Anthony Moschella informed Norgips that he had diverted $150,000 collected from selling Norgips's wallboard to Mexico for another business venture in which he was involved—WoodPal Mexico. Klubak loaned WoodPal $250,000 and feels as though the Moschellas took advantage of him. Anthony Moschella told him that they were "shutting down" WoodPal because they were not making money.

## WoodPal USA

WoodPal USA was formed in 2000 to "import lumber to make pallets." WoodPal is equally owned by the Moschellas and McCarthy. It was created to ease the transfer of money from WoodPal Mexico to the United States. McCarthy testified that she was told that "the purpose of WoodPal USA being set up was solely to get back [her] money out of WoodPal Mexico." McCarthy testified that she invested "a couple hundred thousand more" in WoodPal, but claims that, despite having invested almost $600,000 in it, she was unaware that it had filed bankruptcy.

## Lawsuit

Norgips brought suit alleging fraud, negligent and intentional misrepresentation, conversion and violation of the Texas Theft Liability Act, breach of contract, suit on a sworn account, suit on a guaranty, unfair competition, tortious interference with contractual and prospective business relations, and piercing the corporate veil. The suit was brought against Triple M Supply, LLC, Triple M Operating, Ltd., JTMM Construction, Inc., Anthony Moschella, Michael Moschella, Marcie McCarthy, Woodpal USA, Inc., and Woodpal DeMexico, SA de C.V. Before trial, Triple M Supply, Triple M Operating, the Moschellas,[7] and Woodpal filed for bankruptcy relief, and Norgips non-suited JTMM. Norgips later added Steve Klubak as a defendant and received summary judgment against him. The actions against Klubak and the Moschellas were severed.

The case proceeded to trial against Marcie McCarthy. During trial, Bryne Liner, a certified public accountant and certified fraud examiner, testified that a fraud in-

---

6. Norgips was also listed as a $500,000 creditor on Anthony Moschella's personal bankruptcy filing.

7. Michael Moschella filed for bankruptcy the morning of trial.

vestigation involves looking for, among other things, the flow of money, the relationship between the parties, a lot of "red flags," a lot of related party transactions, a lot of self dealing, and lack of documentation. Liner testified that he found broad categories of patterns in this case:

> Broad patterns. Accounting for inventory issues were all over the place. Inventory should be positive. They're negative. The movement of inventories between companies. The relationships between the parties via JTMM, Triple M Supply, Triple M Operating, Woodpal, the movement of monies, officer's draws. Just a constant common theme between all the companies with respect to the players inside of those companies.... One of the issues we found in this case is, you know, they talk about loans or lack of loan documentation and we made a loan but we have nothing to support it. In some cases I couldn't find support for the loan. Where did the money go? There is this discussion about $600,000.00 to the Isle of Man. I didn't see a note nor did I see that $600,000.00 gone. The fact that $391,000.00 was repaid from one company to another company just out of the goodness of that company's heart, well, that's not how companies work. When you give up something you have to have consideration or value coming back to you. So there is a lot of overlapping lines inside of these companies and it's hard to distinguish this company from this company from this company with respect to the inner relationships that are going on throughout the documents that I looked at.

Liner was concerned about numerous inconsistencies between the bank records, financial records, and tax returns. He testified that the records indicate that Triple M Operating was receiving Norgips's wallboard from Triple M Supply without giving any consideration in return. He was surprised to see on JTMM's ledger that McCarthy received $15,000 in officer draws despite not being listed as an officer and despite her asserted lack of involvement in JTMM. He testified that it was curious that McCarthy received director's fees from Triple M Supply despite her refusal to attend the board meetings. Liner questioned, "What's the value being traded?"

Liner further testified that it was "very important" to note that, on her taxes, McCarthy was designated as a non passive investor in several of her companies. He explained that IRS literature outlines 12 factors to consider when designating an investor as a non passive one. One such factor is whether the investor has 500 hours of involvement in the company. This level of involvement alerts the IRS that the investor is involved in the affairs of the business. A CPA is required to explore this designation before attesting to its inclusion on a tax return.

McCarthy's tax returns indicate that she was a non passive investor for Triple M Supply in 1999 and a non passive investor for Triple M Supply, Triple M Operating, M Global Shipping, and Woodpal, Ltd. in 2000. McCarthy testified that she was unaware of Triple M Operating's existence until this case was filed—this, despite the fact that, one year earlier, her tax returns reflected that she was a non passive investor in that very company. In 2001, McCarthy was a non passive investor of Triple M Supply, M Global Shipping, and Caribe Forest Products.

Liner testified that he was concerned about money going in and out of companies on the same day. "There is no real boundaries between these entities. Even though they're different legal entities, it's sort of like an invisible checkbook." Looking at the financials, Liner testified that "it has the appearance as though it's one big

pile of money." Liner summarized his findings as follows:

You've got multiple companies that are intermingling. You've got monies coming in, monies coming out. You have a lack of documentation. You've got a lack of supporting information. So it becomes an accounting nightmare to say is this a legitimate transaction or not because of the condition or the lack of documentation. You've got transfers between parties. You've got a lot of red flags. You've got monies coming in, monies coming out, same day, same transfer. You are kind of, what in the world is going on? You've got inventories that are being shifted and moved.

When Liner was asked if this was all evidence of a fraudulent scheme, he responded, "I think with respect to the finding of fraud, that's something for the jury to decide."

The jury was asked only two questions: (1) did McCarthy cause Triple M Supply to be used to perpetrate an actual fraud and did perpetrate an actual fraud upon Norgips, primarily for her own direct benefit and (2) what sum of money would compensate Norgips for the conduct found in answer one for unpaid Norgips wallboard invoices and attorney's fees. The jury affirmatively answered the first question and found that Norgips was entitled to $541,850.32 for unpaid wallboard invoices and $52,000 for attorney's fees.

### Charge Error

In issue one, McCarthy argues that the trial court erred in submitting an incorrect definition of "actual fraud" in the jury charge.

### Standard of Review

■ In all jury cases, the trial court must submit instructions and definitions to properly enable the jury to render a verdict. Tex.R. Civ. P. 277. A valid instruction must: (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and evidence. *Union Pac. R.R. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002). The trial court has considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451 (Tex.1997). Therefore, we will not disturb the trial court's decision on which instructions to submit to the jury absent an abuse of discretion. *Id.* at 452.

### Actual Fraud

■ The trial court's charge included the following question to the jury that included each element of the "veil piercing" provision in article 2.21, section A(2) of the Texas Business Corporation Act:

Did Marcella McCarthy cause Triple M Supply, LLC to be used to perpetrate an actual fraud, and did perpetrate an actual fraud upon Norgips, primarily for her own direct personal benefit?

Answer: [Yes]

The charge also included the following definition of "actual fraud":

For the purposes of this charge, "actual fraud" occurred if:

1. Triple M Supply concealed or failed to disclose a material fact within the knowledge of Triple M Supply;

2. Triple M Supply knew that Norgips was ignorant of the fact and did not have an equal opportunity to discover the truth;

3. Triple M Supply intended to induce Norgips to take some action by failing to disclose the fact; and

4. Norgips suffered injury as a result of acting without knowledge of the undisclosed fact.

*See* Tex. PJC § 105.4.

On appeal, McCarthy complains that the language concerning actual fraud contained in the charge was defective because

it did not require a finding of a material misrepresentation.

The trial court overruled McCarthy's objection and stated as follows:

The objection to PJC 105.4 of the fraud instruction, I am overruling the objection based on the discussions I've had with Counsel off the record prior to the final charge conference in which Plaintiffs elect to proceed on a theory of active concealment of material facts which the Pattern Jury Charge tells me may also be actionable as false statements. I believe that comports with the requirement.

We agree with the trial court that actual fraud can be the concealment of material facts *or* the failure to disclose a material fact. *See Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex.1974). Accordingly, the trial court did not abuse its discretion by submitting a definition in accordance with the theory of Norigips's case.

**Duty to Disclose**

■■■ We construe McCarthy's issue on appeal as arguing that the definition of fraud submitted to the jury was incorrect because it is only appropriate when there is a legal duty to disclose. As a general rule, a failure to disclose information will constitute fraud when there is a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex.2001). Thus, silence may be equivalent to a false representation when the particular circumstances impose a duty on the party to speak and he deliberately remains silent. *Id.* Whether a duty exists is a question of law. *Id.* Several courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. *See, e.g., Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 476–77 (Tex.App.-Fort Worth 2004, no

pet.); *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, no writ); *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 636 (Tex.App.-San Antonio 1993, writ denied).

■■ The jury was not instructed about whether McCarthy had a duty to disclose. However, McCarthy's issue on appeal regarding her duty to disclose was not properly preserved at trial. *See* Tex.R.App. P. 33.1. McCarthy's attorney objected to the proposed definition of actual fraud and the omission of a question concerning McCarthy's duty as follows:

In question Number 1 the Court requests whether or not Marcie McCarthy caused Triple M Supply to be used to perpetrate actual fraud and the definition is for concealment or failure to disclose material facts. The evidence is clear that Triple M Supply has no duty. It's not a fiduciary or has any other duty and therefore this is an incorrect charge. Actual fraud should be defined as actual fraud contained in the Pattern Jury Charge.

I object to the charge [on] concealment because there is no duty to disclose. In addition, there is no question to the jury concerning fiduciary duty or establishing a duty to disclose under the statutes or common law.

■■ A party is required to request and tender to the trial court a substantially correct instruction in writing when the trial court omits the instruction from the jury charge. Tex.R. Civ. P. 278; *Yellow Cab and Baggage Co. v. Green*, 154 Tex. 330, 277 S.W.2d 92, 93 (Tex.1985). If a party fails to do so, any error by the trial court in not submitting the instruction to the jury is waived. *Jarrin v. Sam White Oldsmobile Co.*, 929 S.W.2d 21, 25 (Tex. App.-Houston [1st Dist.] 1996, writ denied). Although she objected to the omission of a duty instruction in the charge,

McCarthy did not submit a written instruction regarding duty for the trial court's consideration. Rule 278 of the Texas Rules of Civil Procedure provides, in part:

Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.

Tex.R. Civ. P. 278.

We hold that the trial court did not abuse its discretion in submitting the definition of actual fraud in the jury charge. Accordingly, we overrule issue one.

### Sufficiency of the Evidence

In issues two, three, and six, McCarthy contends that the evidence was legally insufficient to support the jury's findings that (1) Triple M Supply committed an actual fraud, (2) Norgips suffered $541,850 in damages as a result Triple M Supply's and McCarthy's conduct, and (3) Norgips incurred reasonable and necessary attorney's fees in attempting to collect payment from Triple M Supply. In issue five, McCarthy argues that the evidence was legally and factually insufficient to support the jury's finding that she caused Triple M Supply to be used to perpetrate an actual fraud, and did perpetrate an actual fraud upon Norgips, primarily for her own direct, personal benefit.

### Standard of Review

■■■■ In reviewing a "no evidence" issue, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992).

If more than a scintilla of evidence exists to support a finding, a no-evidence challenge fails. *KMG Kanal–Muller–Gruppe Deutschland GmbH & Co. KG v. Davis,* 175 S.W.3d 379, 393 (Tex.App.-Houston [1st Dist.] 2005, no pet.). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id.*

■■■ In reviewing a factual sufficiency complaint, we must first examine all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986). Having considered and weighed all the evidence, we should set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We cannot merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex. App.-Houston [1st Dist.] 1993, writ denied).

### Actual Fraud

■■■ In issue two, McCarthy contends that the evidence was legally insufficient to support a finding that Triple M Supply: (1) concealed a material fact within its knowledge, (2) knew that Norgips was ignorant of the fact and did not have an equal opportunity to discover the truth, (3) intended to induce Norgips to take some action by failing to disclose the fact, and (4) caused injury to Norgips as a result. We hold that there is legally sufficient evidence to support the jury's implied affirmative finding.[8]

---

**8.** The court's charge did not ask the jury to make a separate finding of actual fraud. However, the jury's affirmative answer to question number one, by which Norgips was able to pierce the LLC veil as to Triple M Supply, implies a finding of actual fraud on the part of that company. *See* Tex.R. Civ. P. 276.

Triple M Supply misrepresented to Norgips that a lien on Triple M Supply's receivables could and would be executed to ensure that Norgips would get paid. At the time that Triple M Supply made this misrepresentation, all of its receivables and stock were already pledged to other creditors. One such creditor was McCarthy, who was pledged JTMM's assets. Klubak testified about a meeting during which Anthony Moschella promised to pledge the receivables to Norgips. Triple M Supply also did not disclose to Norgips that only the older accounts, which were least likely to be collected, were held by Triple M Supply, while all the paying accounts had been transferred to Triple M Operating.

Norgips was not told that, starting in July 2000, Triple M Supply stopped invoicing its customers who bought Norgips wallboard. Nor was it told that all of Triple M Supply's assets had been transferred to Triple M Operating. No one from Triple M Supply disclosed this information to Norgips.

Norgips was not informed of and did not have an opportunity to discover these material facts about the way Triple M Supply was operating. There was no UCC filing done to put others on notice of the $600,000 loan before Norgips cleared the shipment with U.S. Customs. The loan was arranged through an entity in the Isle of Man.[9] Norgips also could not verify the truth of Triple M Supply's aging reports that were presented by the Moschellas. These reports appeared to show performing accounts whose payments should have been used to pay Norgips's debt, but were not. Triple M Supply also did not disclose and Norgips had no opportunity to discover that Triple M Operating had begun distributing its wallboard and was the enti-

ty to whom all of the performing accounts had been transferred.

Triple M Supply, with assistance from Klubak, concealed this information because it was trying to "corner the market" for wallboard in Texas. In the summer of 2000, with Klubak's assistance and despite having one-half a shipload of wallboard remaining from the Norgips shipment, Triple M Supply was also buying wallboard from a west coast supplier. Texas was experiencing a shortage of wallboard, and Triple M Supply wanted to buy more wallboard and sell it at a premium. Kingston terminated Klubak's employment when he learned of these transactions and of his divided loyalties.

As a result of Triple M Supply's concealment of these material facts, Norgips was induced to manufacture and transport an entire shipload of wallboard to Houston based on Triple M Supply's purchase order, and it continued to make periodic deliveries of wallboard to Triple M Supply, for which it was never fully compensated.

Viewing the evidence in a light that tends to support the implied finding of actual fraud, we hold that there is legally sufficient evidence to support the jury's implied affirmative finding. As such, we overrule issue two.

**Damages**

 In issue three, McCarthy contends that the evidence was legally insufficient to support a finding that Norgips suffered $541,850 in damages as a result of the fraud of Triple M Supply or the conduct of McCarthy. We hold that there is legally sufficient evidence to support the jury's finding.

With regard to the damages sustained by Norgips, the trial court's charge included the following instruction:

> Man has a reputation "for being a tax haven or a place to money launder transactions."

---

9. Liner testified that he read an article prepared by the FBI explaining that the Isle of

Consider the following elements of damages, if any and none other.

(1) The difference between the value of the Norgips wallboard that Triple M Supply, L.L.C. received and the amount of money that Triple M Supply L.L.C. paid to Norgips for that wallboard.

. . . .

Do not add an amount for interest on damages, if any.

Answer in dollars and cents for damages, if any, for the following elements only:

(1) Unpaid Norgips wallboard invoices:
 Answer: $(541,850.32)

Kingston testified that the total value for the wallboard sold to Triple M Supply was $1,047,000. Of that amount, Triple M Supply only paid $504,800, leaving an unpaid balance of $541,850.[10] At trial, and as noted by McCarthy in her briefing to this Court, Anthony Moschella agreed that "Triple M Supply has not paid to Norgips the amount of $541,850.32 and that amount is owed to Norgips." Furthermore, Klubak testified that he was aware that the Moschellas received and used Norgips's board without paying for it.

We hold that there was legally sufficient evidence to support the finding that Norgips was owed $541,850.32 in unpaid wallboard invoices. Accordingly, we overrule issue three.

## Attorney's Fees

In issue six, McCarthy contends that the evidence was legally insufficient to support the jury's finding that Norgips incurred $52,000 as its "reasonable and necessary attorney's fees ... in attempting to collect payment from Triple M Supply, Inc." We hold that there is legally sufficient evidence to support the jury's finding.

Norgips's attorney testified that Norgips incurred $39,000 in attorney's fees and slightly less than $15,000 in expenses from the time that Norgips initiated this suit until Triple M Supply filed for bankruptcy. McCarthy complains, however, that Norgips's attorney "gave no testimony on the issue of reasonable and necessary attorney's fees expended 'in an attempt to collect payment from Triple M Supply' as Question No. 2 requested." McCarthy further argues that, because there were numerous defendants before the various bankruptcy filings, non-suit, and summary judgment, the charge question should have segregated "attorney's fees to the various Defendants."

Norgips's attorney testified that his fees were reasonable and necessary. He explained that, "[i]t's a fairly complicated situation, as you've come to learn in the past few days, and it took a while for us to unravel and begin to understand the interrelationships of these entities." On cross-examination, McCarthy's attorney questioned him regarding the actual fees that would have been incurred had Triple M Supply been the only defendant. Norgips's attorney responded, "that's sort of a factually intensive ... question. Every circumstance is a little different." During the charge conference, McCarthy objected to the submitted charge, and the following exchange occurred:

McCarthy: I object to Question Number 2—2—subpart 2 on the reasonable and necessary expenses Norgips expended in attempting to collect as Counsel in his testimony did not segregate the attorney's fees between collecting from Triple M, Inc. and the other six Defendants that were sued in the original petition in this case. As a result that question should not

---

10. The exact numbers submitted to the jury by way of exhibit were as follows: sales of $1,046,652.16; collected $504,801.84; leaving a balance of $541,850.32.

be asked and there is no evidence to support same.

Court: Response, Counsel?

Norgips: Your Honor, we, under our theory of the case, are presenting attorney's fees as a component of the fraud damage question being submitted to the jury, the fraud committed by Ms. McCarthy that we allege is part of a fraudulent scheme involving all of these entities. As a result, we don't believe we had a duty to segregate and isolate our claims, only as to Triple M Supply. Even had we done so, the fees were so intertwined as to become indistinguishable one from the other. And the testimony, finally, supported that under [McCarthy's] theory. Had we proceeded to obtain a summary judgment only against Triple M Supply and no other entity, we would still have gone through the same amount of labor and expense in order to reach that result given that it would have required taking the deposition at a minimum of Anthony Moschella.

Court: I'm going to overrule the objection. I believe the question as phrased permits both parties to present their arguments to the jury on that—on that issue and I believe that's where the responsibility for determining what, if any, attorney's fees were reasonable and necessary as incurred by Norgips, I believe that responsibility lies with the jury.

We agree with the trial court that, in this case, the jury was responsible for determining the amount of reasonable and necessary attorney's fees. Based on the record presented, we hold that there is legally sufficient evidence to support the jury's award of attorney's fees, and we overrule issue six.

## Piercing the LLC Veil

 In issue four, McCarthy argues that there was legally and factually insufficient evidence to support the jury's finding that she caused Triple M Supply to be used to perpetrate an actual fraud and did perpetrate an actual fraud upon Norgips, primarily for her own direct personal benefit. As a result of this finding, Norgips was able to pierce the LLC veil around Triple M Supply and recover damages from McCarthy, individually.

The evidence showed that McCarthy had contributed $391,000 to Triple M Supply as a start-up business. McCarthy was aware of the fraudulent business practices of Anthony Moschella, including using one entity to pay another's bills. She did nothing to stop these practices. Furthermore, she accepted interest payments on her loan and ultimately received repayment in full, at the expense of Norgips and other creditors. The evidence presented at trial showed that the fraudulent operation of Triple M Supply simply would not have been possible without McCarthy's contributions.

McCarthy testified that her involvement in the daily affairs of Triple M Supply stopped in late 1999 or early 2000. She did not regularly attend board meetings and claimed to be unaware of Triple M Supply's purchase agreement with Norgips and the existence of Triple M Operating until after this suit was instituted. She received her last officer's check in April 2000, shortly before Triple M Supply took delivery of Norgips's wallboard.

McCarthy was an equal participant and director in most of the entities that participated in defrauding Norgips. The fraudulent conduct would not have been possible without McCarthy's infusion of capital into Triple M Supply. Triple M Supply was organized as a Texas Limited Liability Company ("LLC") about six weeks after

McCarthy's contribution of "seed money." There was no evidence that Triple M Supply executed a promissory note or that this was, in fact, a capital contribution. Triple M Operating borrowed $600,000–$391,000 of which was used to repay McCarthy's "loan." Even though the repayment to McCarthy was diverted through another entity, McCarthy was made whole at the expense of Norgips, who was owed more than $540,000 by Triple M Supply. McCarthy received health insurance, a salary, officers' draws, and interest payments as compensation for being an owner of Triple M Supply. Furthermore, McCarthy was aware of the fraudulent manner in which Triple M Supply was being managed. She admitted that she knew Triple M Supply was paying the debts of other companies. McCarthy willingly received substantial interest payments on her loans despite her knowledge of Anthony Moschella's fraudulent business practices.

Because there was legally and factually sufficient evidence to support the jury's finding, we overrule issue four.

## Individual Liability

■ In issue five, McCarthy argues that the trial court erred in finding her liable for Triple M Supply's debt because, pursuant to the Texas Limited Liability Company Act ("TLLCA"), a member of a Texas limited liability company ("LLC") is liable in very limited circumstances and, specifically, not for a debt. TEX.REV.CIV. STAT. ANN. art. 1528n, § 4.03(A) (Vernon 2006). McCarthy argues that because the TLLCA does not address whether or under what circumstances a litigant may "pierce" the veil of an LLC for corporate debt, the veil is impenetrable. We disagree.

■ Generally, members are not individually liable for the debts of the LLC.[11] The TLLCA provides in pertinent part that: "Except as and to the extent the regulations specifically provide otherwise, a member or manager is not liable for the debts, obligations or liabilities of a limited liability company including under a judgment decree, or order of a court." TEX. REV.CIV. STAT. ANN. art. 1528n, § 4.03(A) (Vernon 2006). The TLLCA does not address whether or under what circumstances a litigant may "pierce" the corporate veil of an LLC in order to hold a member liable for a debt of the LLC. *Id.*

However, Texas courts and other jurisdictions, have applied to LLCs the same state law principles for piercing the corporate veil that they have applied to corporations. *See e.g. Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners' Ass'n,* 77 S.W.3d 487, 499 (Tex.App.-Texarkana 2002, pet. denied) (applying corporate alter ego veil piercing precedent in analyzing plaintiff's attempts to pierce veil of LLC); *In re Secs. Inv. Prot. Corp. v. R.D. Kushnir & Co.,* 274 B.R. 768, 775–76 (Bankr. N.D.Ill.2002) (concluding that, while Illinois LLC Act precludes piercing on basis of failure to follow formalities, nothing in statute bars piercing LLC veil on other grounds applicable to corporations); *Hamilton v. AAI Ventures, L.L.C.,* 768 So.2d 298, 302 (La.App.2000) (applying corporate veil piercing principles in upholding trial court's piercing of LLC veil to hold member liable on LLC contract); *Kaycee Land & Livestock v. Flahive,* 46 P.3d 323, 327 (Wyo.2002) (holding that, while Wyoming LLC Act was silent as to veil piercing, there was no policy or legal reason to treat LLCs different from corporations in this

---

11. A limited liability company is any company organized and in existence in conformity with the TLLCA. TEX.REV.CIV. STAT. ANN. art. 1528n, § 1.02(A)(3) (Vernon 2005). A limited liability company is a separate and distinct entity from other types of business entities already in existence in Texas, such as the corporation or the limited partnership.

regard; when LLC has caused damage and has inadequate capitalization, co-mingled funds, diverted assets, or used LLC as a mere shell, individual members are immune from liability. Legislative silence cannot be stretched to condone such an illogical result.). McCarthy has not offered, nor can we find, any judicial support for the proposition that existing state law doctrines of piercing the corporate veil should not be applied to LLCs.

Texas courts have disregarded the corporate fiction and pierced the corporate veil when the corporate form has been used as part of an unfair device to achieve an inequitable result. *See Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986), *superseded in part by statute,* TEX. BUS. CORP. ACT ANN. art. 2.21(Vernon Supp. 2005). Specifically, courts have disregarded the corporate form when it is used as a sham for perpetrating a fraud. *Id.*

Here, the trial court did not err in its application of law. The jury found that McCarthy used an LLC as a sham to perpetrate a fraud, and the trial court applied this finding to pierce the corporate veil of the LLC. The jury found that McCarthy used Triple M Supply LLC to perpetrate actual fraud and did perpetrate actual fraud upon Norgips primarily for McCarthy's own direct personal benefit.[12] As shown above, there was evidence presented at trial that McCarthy and her two partners (1) used Triple M Supply as a front to borrow funds and order wallboard on credit from Norgips and others; (2) diverted to themselves and to entities in which McCarthy had either an ownership and/or financial interest, proceeds due to Triple M Supply through the use of complex and undocumented financial transactions and the commingling of inventory and bank accounts; and (3) left Triple M Supply undercapitalized and unable to pay its creditors.

McCarthy had a direct ownership and/or financial interest in each of the entities that benefited from sums due to Triple M Supply: JTMM, M Global, Triple M Operating, and Woodpal. Funds and inventory of these companies were intermingled without documentation, as evidenced by Anthony Moschella's frequent financial transfers among the various entities. Funds from Triple M Supply were being used to pay the debt of JTMM. Triple M Operating was paying the debts of Triple M Supply. After a checking account for Triple M Supply was opened, large sums of money were transferred out of Triple M Supply's bank account to several related businesses including K–Cor Supply and JTMM. Additionally, over $500,000 of inventory was switched "on the books" from JTMM Supply to Triple M Supply without any further documentation between the two companies. Triple M Supply was then loaded with debt and subsequent creditors, including Norgips, were not paid back. McCarthy, however, was paid. This was the case even though significant deposits were made to Triple M Supply from customer payments from the sale of Norgips's wallboard. As a result of these acts, Triple M Supply was left undercapitalized and without sufficient funding to pay its debts.

Accordingly, we hold that the trial court did not err in finding McCarthy liable on Triple M Supply's debt. As such, we overrule issue five.

---

**12.** Article 2.21, which is specifically applicable to traditional corporations, provides for piercing the corporate veil where there is a finding that the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the" shareholder. *See* TEX. BUS. CORP. ACT ANN. art. 2.21(A)(3) (Vernon Supp. 2005).

## Conclusion

We affirm the trial court's judgment.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

Because the majority errs in concluding that the evidence is legally sufficient to support the jury's finding that appellant, Marcie McCarthy, primarily for her own direct personal benefit, caused Triple M Supply, LLC ("TMS") to be used to perpetrate an actual fraud, and did perpetrate an actual fraud upon appellee, Wani Venture, A.S., as successor in interest to Norgips USA, Inc. (collectively "Norgips"), I respectfully dissent.

In her fourth issue, McCarthy argues that the trial court erred in entering judgment against her because there is no evidence that she was a substantial factor in causing Norgips's injury, that she caused TMS to be used to perpetrate a fraud, and that a fraud was committed "primarily for her own direct personal benefit." In sum, she contends that there is no evidence that she "knew of any alleged 'fraudulent scheme,' much less being a substantial factor, in bringing about the injury to Norgips, or that money [she] received was related to any fraudulent scheme."

## Standard of Review

We must sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005). Evidence does not exceed a scintilla if it does no more than create a mere surmise or suspicion that a fact ex-

ists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. In conducting a legal sufficiency review of the evidence, a court must consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.*

As further explained by the Texas Supreme Court,

> The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach]. There must necessarily be a logical connection, direct or inferential, between the evidence offered and the fact to be proved. However, we must also bear in mind the difference between materiality of the evidence and the issue of evidentiary sufficiency. Simply because a piece or pieces of evidence are material in the sense that they make a "fact that is of consequence to the determination of the action more ... or less probable," does not render the evidence legally sufficient.

*Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 24–25 (Tex.1994) (citations omitted). As Professor McCormick emphasized, "a brick is not a wall." *Id.* (quoting Charles T. McCormick, HANDBOOK OF THE LAW OF EVIDENCE § 152 (West ed.1954)).

## Actual Fraud

Generally, under Texas law, shareholders are not liable for the debts of a corporation; however, Texas courts will pierce the corporate veil to prevent fraud or to achieve equity. *Castleberry v. Branscum*, 721 S.W.2d 270, 271–72 (Tex.1987). In particular, courts will disregard the corporate fiction when individuals exploit the

corporate form as a sham to perpetrate a fraud. *Id.* at 272. In response to *Castleberry,* the Texas Legislature amended article 2.21 of the Texas Business Corporations Act in 1989 to establish "a clear legislative standard under which the liability of a shareholder for the obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto." TEX. BUS. CORP. ACT ANN. art 2.21, Comment of Bar Committee–1996 (Vernon 2003).

Under article 2.21A, a shareholder has no obligation to the obligees of a corporation regarding any contractual obligation of the corporation on the basis of actual or constructive fraud or a sham to perpetrate a fraud, "unless the obligee demonstrates that the [shareholder] ... *caused* the corporation to be used for the purpose of perpetuating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the [shareholder]...." *Id.* art. 2.21A(2) (emphasis added). Actual fraud occurs when:

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

*Bradford v. Vento,* 48 S.W.3d 749, 754–55 (Tex.2001). The test for cause in fact is whether an "act or omission was a substantial factor in bringing about injury," without which the harm would not have occurred. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex. 1995).

In accordance with article 2.21A(2) and case law, the trial court instructed the jury on actual fraud and to answer the following question:

> Did Marcella McCarthy cause Triple M Supply, LLC to be used to perpetrate an actual fraud, and did perpetrate an actual fraud upon Norgips, primarily for her own direct personal benefit?
>
> > For purposes of this question, you are instructed that to "cause" is to be a substantial factor in bringing about an injury that would otherwise not have occurred. There can be more than one cause.

The jury answered this question, "Yes."

Thus, Norgips had the burden to prove that McCarthy actually did in fact cause TMS to be used to defraud Norgips primarily for her own direct personal benefit. Here, however, there is no evidence that McCarthy did anything or omitted to do anything to actually cause TMS to be used to perpetrate an actual fraud, and did perpetrate an actual fraud, upon Norgips. Nor is there any evidence that she did any such thing "primarily for her own direct personal benefit."

Norgips argues that the evidence is legally sufficient to support the jury's finding essentially because McCarthy (1) provided $391,000 as seed money to start up TMS as proposed by her boyfriend, Michael Moschella, and his brother, Anthony Moschella; (2) admitted that "[d]uring the maiden year for [TMS]," she took an active role in the business," was vice president, and, held a one-third interest in it; (3) accepted "both pay checks and benefits from the third party employee leasing company as salary" and checks from JTM Supply and TMS as her "director's fee" or "officer's draw"; (4) "went to dinner with Michael and Steve Klubak in Florida"; (5) knew that TMS was paying the debts of other companies; (6) accepted checks from

TMS "as payment on secured debt owed by JTM"; (7) claimed that Anthony Moschella stated that "he could do whatever he wanted with the money in any of the companies' accounts"; (8) although she "reduced her hands-on activities," she "condoned through her silence and inaction, Anthony's total disregard of his representation to the State of Texas and Norgips that [TMS] had been organized to conduct 'lawful business' "; (9) "did not combine the power of her third ownership with the third ownership of her boyfriend Michael, to take control of the company and conduct its business lawfully"; (10) did not hire an accountant, invoke her rights to see a complete set of company books and records, resign as vice president, or assign or give away her interest in TMS; and (11) she "got her money back" and was made whole at the expense of TMS. In sum, "she took the route that she thought was the best way to protect her own initial contribution of $391,000, her fees, her salary, and her benefits."

However, none of this evidence, taken separately or together, supports a logical inference that McCarthy in fact caused TMS to be used to perpetrate an actual fraud, and did perpetrate an actual fraud, upon Norgips, primarily for her own direct personal benefit. In fact, Norgips concedes in its briefing to this Court that McCarthy "would not admit that she knew anything about Norgips or TMS's transfer of funds in the year 2000." Although Norgips asserts that the jury was free to disbelieve her denial of knowledge, it directs us to no evidence in the record that supports an inference that she in fact had knowledge of Anthony Moschella's dealings with Norgips.

The majority acknowledges that McCarthy testified that her involvement in the daily affairs of TMS actually ceased in late 1999 or early 2000, she did not regularly attend board meetings, and was unaware of TMS's purchase agreement with Norgips until Norgips filed the instant suit. It also notes that she received her last officer's check in April 2000, before TMS received delivery of Norgips's wallboard.

Nevertheless, the majority holds that the evidence is legally sufficient to support the jury's finding. It notes that McCarthy had contributed $391,000 to TMS as a start-up business; accepted interest payments on her loan and was ultimately fully repaid, at the expense of Norgips and other creditors; was an "equal participant and director in most of the entities that participated in defrauding Norgips"; received health insurance, a salary, officers' draws, and interest payments as compensation from TMS; and knew that TMS "was paying the debts of other companies." Most importantly, the majority asserts that McCarthy was "aware of the fraudulent business practices of Anthony Moschella, including using one entity to pay another's bills." The majority concludes that the fraudulent operation of TMS "simply would not have been possible without McCarthy's contributions" and faults her for doing nothing to stop the practices of Anthony Moschella.

When the majority makes the conclusory statement that McCarthy "was aware of the fraudulent business practices of Anthony Moschella," the only evidence in the record of her knowledge of his activities is that, as testified to by McCarthy herself, she "[d]idn't like the way Tony did things." She was asked, "what was the source of the clash between you that led to your leaving the office?" McCarthy answered, "the interest checks were paid to me and I would question him about why one company was paying interest that another company owed the debt and he would just shrug me off. He wouldn't give me answers and stuff like that." She did know that TMS was paying JTM's debt; howev-

er, McCarthy also testified that she took issue with the fact that Anthony Moschella said he could run the business the way he wanted to and "[n]o matter what I said or did I couldn't get results from him for anything." However, although the majority characterizes this testimony as knowledge of "the fraudulent business practices of Anthony Moschella," McCarthy actually testified that she was not even aware of the fact that TMS placed an order with Norgips for sheet rock until after this lawsuit was filed. Nothing in the record contradicts her testimony or otherwise shows that she had any knowledge of the Moschella brothers' actions in regard to Norgips.

The bottom line is that none of the evidence relied upon by Norgips and the majority supports an inference that McCarthy actually did anything whatsoever to intentionally or knowingly cause TMS to be used to perpetrate an actual fraud, and did perpetrate an actual fraud upon Norgips, primarily for her own direct personal benefit. As argued by McCarthy, there is simply no evidence that she caused TMS to be used to perpetrate a fraud, that a fraud was committed "primarily for her own direct personal benefit," or that any omission by her was a substantial factor in bringing about Norgips's injury.

Simply because Norgips presented many pieces of evidence that might be considered material does not mean that the evidence is legally sufficient to support the jury's findings. *See Moriel,* 879 S.W.2d at 24–25. There is simply no evidence in the record that McCarthy actually exploited the corporate form of TMS as a sham to perpetrate a fraud upon Norgips for her own personal gain. Thus, although the majority has a lot of scattered bricks, it has no wall. *See id.*

Accordingly, I would sustain McCarthy's fourth issue, reverse the judgment of the trial court, and render judgment in favor of McCarthy.