# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00205-CV

**Elisha Mason, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT NO. 238,939-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Elisha Mason appeals from the trial court's order terminating her parental rights to her minor children, L.M. and A.M., after a jury found that her rights should be terminated. On appeal, Mason argues that the trial court erred in refusing to give a jury instruction on evidence spoliation and in admitting certain evidence. She also claims that the evidence is legally and factually insufficient to show that statutory grounds for termination exist and that termination is in the best interests of the children. *See* Tex. Fam. Code. Ann. § 161.001 (West Supp. 2011). We affirm the judgment of the trial court.

## BACKGROUND

Elisha Mason experienced significant traumas throughout her childhood.[1] She repeatedly moved from school to school, was neglected and abused by her mother and multiple other

---

[1] The facts recited herein are taken from the testimony and exhibits presented at trial.

family members, and was placed in foster care. When Mason was seventeen years old and had recently graduated from high school, she married Jeffrey Mason.[2] Together, they moved into the California home of Jeffrey's lifelong friend, John Kennedy, and his wife. Being more than twenty years older than Mason and Jeffrey, Kennedy took on a fatherly role toward them, and he discussed legally adopting Mason. However, Mason and Kennedy at some point developed a sexual relationship, which they conducted in secret while still living with both of their spouses.

During this time, Mason became pregnant and gave birth to her first daughter, L.M. Mason did not know whether Jeffrey or Kennedy was the father, but she represented to Jeffrey that he was. When Mason became pregnant a second time, she was again unsure of which man was the father, but she represented that it was Jeffrey. Jeffrey joined the Army and was assigned to serve at Fort Hood near Killeen, Texas. In January 2009, Mason moved from California to join him. Kennedy accompanied Mason at the request of Jeffrey, who expressed concern about Mason moving by herself while pregnant.

Shortly after moving to Texas, Mason gave birth to her second daughter, A.M. Mason also ended her sexual relationship with Kennedy. Kennedy became very upset and continued to pursue a relationship with Mason without success. Nevertheless, Kennedy continued living with Mason and Jeffrey in Texas. In addition, Mason would later file charges alleging that within a few weeks after A.M.'s birth and before Mason was ready to engage in sex again, Jeffrey forced her to have vaginal and anal intercourse with him. This charge was reported to the Department of Family

---

[2] Jeffrey and Elisha Mason have since divorced, but still share the same last name. As a result, we will refer to Jeffrey by his first name for clarity.

and Protective Services (the Department), which began investigating the family in March 2009. The Department took no action as to L.M. and A.M., however, because any abuse of the girls was ruled out.[3] Eventually, Jeffrey moved out and initiated a divorce from Mason.

Mason continued living with Kennedy, but she began a new relationship with twenty-eight-year-old Army specialist John Stanton. Stanton moved in with Mason and Kennedy. Stanton also began to pursue a divorce from his estranged wife so that he and Mason could marry. Around this time, Mason began communicating on the Internet with someone she believed was named Mary Ann Lipton. According to Mason, Lipton "hadn't been laid in a while" and asked for videos of Mason having sex. Mason agreed, and on at least two occasions, she and Stanton used a webcam to transmit to Lipton live video of themselves having sex.

However, the videos ended up in the possession of Kennedy, who presented them to the Department. According to a supervisor at the Department named Orvando Freeman, Kennedy brought the videos to the Department in person and was joined by a Killeen Police Department officer. Freeman testified that he and the officer watched fifteen to twenty video clips on Kennedy's laptop. According to Freeman, one clip showed Mason and Stanton engaged in sex while eight-month-old A.M. was awake in an infant swing in the same room, and another clip showed two-year-old L.M. in the bed with Mason and Stanton while they had sex.

**The Department's investigation**

On September 10, 2009, the Department began an investigation for negligent supervision of L.M. and A.M. In an interview with a Department employee, Mason admitted that

---

[3] The Department did receive multiple reports of physical and sexual abuse of L.M. and A.M. over the following months, but ruled out any abuse in these instances as well.

she made sex videos with Stanton and that A.M. was in her swing in the room while one of the videos was made. She also admitted that she used to make web videos for soldiers overseas of herself playing with sex toys. The investigator felt Mason was nonchalant about sexual activity in front of her children and did not take it seriously.

The Department next held a meeting with Mason, Stanton, and Kennedy to reach an agreement on whether the children should stay in the home. At the meeting, Mason and Kennedy began exchanging accusations about each other's deficiencies as a parent. Mason said that Kennedy often locked himself and L.M. in his room, where he kept and regularly watched pornography, and she was unsure whether he watched pornography with L.M. present. After this exchange, the Department secured an agreement from the family that L.M. and A.M. were not safe in the home. Both were sent to live with the family of Jeffrey's commanding officer. The Department pursued the children's removal from the home before a trial court. After a show-cause hearing on October 7, 2009, removal was granted. Around the same time, DNA testing revealed that Kennedy was the biological father of both children.

Following the court-ordered removal, the conservatorship division of the Department took over the Mason case. A guardian ad litem was appointed for the children, and she noted that L.M. engaged in various disturbed behaviors after leaving Mason's home. These behaviors included touching her private areas, biting herself or pinching her nipples when she was upset, "humping" her stuffed animals, undressing her Barbie dolls and tickling their genital areas, and undressing herself if left alone. Because of L.M.'s age, the guardian ad litem believed these behaviors were the result of observing or participating in sexual activity. L.M. was also aggressive with other children, was

4

caught smearing her feces and trying to eat it, would scream and bang her head, and had night terrors. The guardian ad litem observed that these behaviors worsened after L.M. had visits with Mason.

At a conference two weeks after the removal, the Department created a family service plan through which Mason could work toward regaining custody of L.M. and A.M. The plan required Mason to receive psychological and psychosexual evaluations, undergo therapeutic counseling, attend parenting classes, pay child support, and visit her children with supervision. Mason participated in the required activities, but reports were mixed as to her level of engagement. For example, Mason would sometimes nap with A.M. rather than interact with her during their visits. Whether or not A.M. appeared tired, Mason would hold A.M. down until she fell asleep and then lie down and sleep beside her.

On other occasions, Mason showed a poor understanding of L.M.'s behavioral development. Once, she reacted angrily when L.M. tried to open the visitation room door before the end of their session. Mason shouted at L.M., using her full name and saying to "get her butt back in the room." L.M. appeared highly remorseful as a result. Another time, after L.M. grabbed a toy from Mason's hand, Mason became angry and said she would not play with L.M. anymore and would take something from L.M. In addition, Mason's therapist felt she was not striving to progress in making mature decisions or taking responsibility for her problems. Mason continually blamed Kennedy or the State for the loss of her children, which she mainly discussed in terms of her own hardship, despite being urged to give more thought to the children's interests.

**The jury trial**

Ultimately, the Department sought a termination of Mason's parental rights. At a trial beginning on January 18, 2011, a jury heard testimony from various Department employees and

5

mental health care providers as well as Mason, Stanton, and the foster mother of L.M. and A.M. One witness was Dr. Michael Campbell, a licensed psychologist who testified about his psychological evaluation of Mason. Campbell heard Mason's account of her history of abuse and her recent activities with the webcam. He diagnosed Mason with Bipolar Disorder and Borderline Personality Disorder, which he explained is marked by emotional instability and is very difficult to treat. He also determined that her judgment and insight were impaired. Campbell concluded that Mason subjected L.M. and A.M. to a risk of abuse and neglect and needed five to ten years of weekly therapy, even after which her parenting might not improve.

Campbell also testified that he conducted a psychological evaluation of Kennedy. He concluded, "I don't know that he has pedophilic tendencies, but because he's so egocentric, selfish, narcissistic, I wouldn't leave a child alone with him." Further, Campbell testified that while there is "not much evidence" that witnessing sexual acts is harmful to eight-month-olds, "it certainly couldn't be helpful." He also testified that, based on the limited information he had, he "would probably vote to terminate" Mason's rights to the children.

In addition, licensed psychologist Dr. Timothy Daheim testified as to his psychosexual evaluation of Mason. He testified that Mason admitted making explicit videos with at least one of her children present. He said this could expose the children to pedophiles, who "are pretty aroused by seeing sexual activity with a child involved or even watching the action."

Daheim determined that Mason was unable to appreciate the seriousness of her actions. He concluded that Mason failed to provide proper care and protection for L.M. and A.M., put their emotional and physical well-being at risk, and allowed them to remain around men who

6

endangered their emotional and physical well-being. Moreover, he did not believe this assessment would have changed if he could have seen Mason regularly for a year or longer. As a result, he "strongly" recommended not returning the children to Mason.

Breanna Bearden, a licensed clinical social worker who supervised Mason's visits with L.M., also testified. She recalled that Mason's parenting was not always "appropriate." For instance, in addition to the incidents mentioned above, she recalled a session when L.M. had a dirty diaper that caused the entire room to become "pretty smelly," yet Mason never changed the diaper. She also said Mason manipulated L.M. with toys; that Mason made only "perfunctory" attempts at parenting such as telling L.M. to say "please" and "thank you" or use a tissue when she coughed; and that L.M. appeared unattached to Mason. Ultimately, she testified that "it could be very damaging" for L.M. and A.M. to be returned to Mason.

Dianne Campbell, a licensed clinical social worker, testified as to the individual therapy she provided to Mason as part of the family service plan. Campbell testified that Mason had a history of depending on and being taken advantage of by men. She noted that Mason discussed possibly returning to Jeffrey with L.M. and A.M. even though she had accused Jeffrey of rape. Campbell thought this reflected "extremely poor judgment and very poor boundaries." She also noted that Mason could not seem to make plans or consistent efforts toward achieving a more stable life. Mason claimed to be looking for work, and she did eventually find a job in food service, but Campbell sensed that Mason never put much effort into the job search. Mason also mentioned an interest in going to culinary school, but dismissed Campbell's encouragement with a list of excuses for why she could not do so.

7

Campbell said that when she asked Mason what changes she was making to her life, Mason would answer that she was cursing less or had not left Kennedy after a recent argument. Campbell concluded that Mason's participation in therapy was "superficial." Campbell ultimately stated that L.M. and A.M. should not be returned to Mason and recommended termination of Mason's parental rights.

Finally, the Department presented testimony from Sarah Rushing, the foster mother of L.M. and A.M. at the time of trial.[4] She testified that A.M. appeared distant and rarely smiled when she first arrived with the Rushings, but had grown to be happy, talkative, and loving by the time of trial. She also noted that L.M. was developmentally delayed at first, but had developed impressively ever since. L.M.'s nightmares and sexual behaviors had also stopped entirely.

Rushing stated that she had a bachelor's degree in child development and worked as a teacher for two-year-olds. She described the active, loving, and "wonderful" family life that she and her husband provided for L.M. and A.M. Rushing further stated that L.M. and A.M. called the Rushings "mommy" and "daddy," whereas she had heard L.M. refer to Mason by her first name on one occasion. Rushing testified that she and her husband wished to adopt L.M. and A.M. and that it was in the girls' best interests for Mason's parental rights to be terminated. She stated that L.M. and A.M. should not only continue to live with the Rushings, but also have the certainty of an official adoption rather than prolonged foster care. She said the girls' responses to visits from Mason suggested that further visitation would only cause them confusion and instability.

---

[4] L.M. and A.M. were placed with the Rushing family about one year before trial, after the family of Jeffrey's commanding officer, with whom they were originally placed, was forced to move into a smaller home that could not accommodate foster children.

Mason testified in defense of her parental rights. She confirmed that she had begun an affair with Kennedy when she was seventeen and had been unsure whether he or Jeffrey fathered her children. Mason expressed that she wished to move away from Kennedy, but he locked himself in his room with L.M. or threatened to leave with the children whenever she tried. Nevertheless, she admitted that she still left L.M. and A.M. alone with Kennedy on at least one occasion.

Asked about her webcam activities, Mason admitted that she had sent explicit videos to soldiers overseas and filmed herself having sex with Stanton for Mary Ann Lipton. Mason denied that two-year-old L.M. was ever in the room while the videos were made, claiming that Dr. Daheim misheard her or was lying when he testified that she admitted to making sex tapes in the presence of both children. However, she admitted to having sex in front of eight-month-old A.M. When asked whether she considered the impact on A.M. of having sex in front of her, Mason stated, "I wasn't thinking at the time." In addition, she described Lipton as "just someone else to talk to" and stated, "To tell the truth, I honestly can't tell you" what she hoped to accomplish in sending the videos. Despite these admissions, Mason stated that she had always taken parenting seriously and claimed she was "willing to do anything" for her children.

During trial, an issue arose with regard to the evidence of Mason's explicit videos. Following the testimony of CPS supervisor Freeman about the videos he watched, the Department tendered to Mason's counsel the only video disc it possessed. This disc contained just seven or eight video clips of Mason and Stanton having sex, none of which showed L.M. or A.M. in the room. Mason's counsel thus argued that additional clips must exist on a different disc that the Department would not or could not produce. Freeman stated that he did not know where the rest of the clips

were located, as Kennedy gave him only one disc that Freeman assumed contained all of the clips. Other Department employees offered differing testimony as to the existence and disposition of other clips. For example, it was suggested that the missing video files had been corrupted or had been received by the Killeen police, instead of the Department, directly from Kennedy.

Mason's counsel argued for the court to strike Freeman's testimony about the unavailable clips and instruct the jury to disregard it. The court responded, "Well based on the information that I have, I don't think it's appropriate for a spoliation instruction." Later, when the Department moved to admit the disc it possessed into evidence, Mason's counsel objected on the grounds that it was more prejudicial than probative. The court replied, "Well, I think you folks have sort of made these tapes the focal point of your trial, so your objection is overruled." The court also overruled a later objection that the Department laid an inadequate predicate for admission of the disc. The disc was admitted, and the video clips were played for the jury.

At the close of testimony, the court issued a proposed charge that did not include a spoliation instruction. At the charge conference, Mason's counsel did not submit a proposed spoliation instruction or state "any objections or additional submissions or requests" when invited by the court to do so. After deliberating, the jury issued a verdict that the parent-child relationship between Mason and L.M. and A.M. should be terminated. The trial court issued a decree of termination on March 25, 2011.

On April 13, 2011, Mason filed a motion for new trial. The motion complained of the court's admission of evidence that was irrelevant, prejudicial, and lacked a proper predicate and the court's refusal to strike Freeman's testimony or give a spoliation instruction. Subsequently, on

10

May 11, 2011, Mason filed an amended motion for new trial that further complained of insufficient evidence to support a finding of grounds for termination. The court denied Mason's amended motion, and this appeal followed.

**STANDARD OF REVIEW**

In a legal-sufficiency review of a termination case, we must look at all the evidence in the light most favorable to the jury's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding where a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* We may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *City of Keller v. Wilson*, 168 S.W.3d 802, 819, 822 (Tex. 2005).

Evidence is factually sufficient in termination cases if the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard "retains the deference an appellate court must have for the factfinder's role." *Id.* at 26. In a factual-sufficiency review, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Landry's Seafood House-Addison, Inc. v. Snadon*, 233 S.W.3d 430, 436 (Tex. App.—Dallas 2007, pet. denied).

11

Mason also complains of the trial court's refusals to exclude evidence and to issue a jury instruction. We review both of these types of trial-court decisions for abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 719 (Tex. 2003). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). We may not declare a trial court's ruling to be an abuse of discretion simply because we would have reached a different conclusion. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985).

## DISCUSSION

**Legal and factual sufficiency**

We first address Mason's third, fourth, and fifth issues on appeal. In these issues, Mason argues that the evidence is legally and factually insufficient to support the jury's findings that statutory grounds existed for termination of Mason's rights to the children and that termination was in the children's best interests. To terminate the parent-child relationship, the factfinder must find clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the child's best interests. *In re C.H.*, 89 S.W.3d at 23. "Clear and convincing evidence" is the degree of proof required to produce a firm belief that the Department's allegations are true. *Id.*

The Department responds that Mason's sufficiency challenges should be overruled because she has not preserved them for appeal. According to the Department, Mason filed no

12

motion for instructed verdict, motion for judgment notwithstanding the verdict, objection to the submission of a jury question, or motion to disregard the jury's answer to a vital question. As a result, the Department reasons, only a specific point in a timely motion for new trial could preserve Mason's legal- and factual-sufficiency complaints for appellate review. Noting that Mason did not raise the issue of evidence sufficiency until she filed an untimely amended motion for new trial, the Department concludes that this issue was not preserved. The Department also urges that, even if Mason's sufficiency claims are considered, they should be overruled because the evidence was legally and factually sufficient to support the jury's findings.

First, we address the Department's contention that Mason failed to preserve her sufficiency claims on appeal. Generally, if a party fails to preserve an issue for appeal, this Court should not address the merits of that issue. *See* Tex. R. Civ. P. 33.1; *see also In re J.F.C.*, 96 S.W.3d at 304–05 (noting that appellate courts' refusal to consider unpreserved errors in parental-termination cases, except in cases of fundamental error, serves the Legislature's intent that such cases be expeditiously resolved).

To preserve a challenge to the legal sufficiency of evidence in a jury trial, a party must either (1) file a motion for instructed verdict, (2) file a motion for judgment notwithstanding the verdict, (3) object to the submission of the issue to the jury, (4) file a motion to disregard the jury's answer to a vital fact issue, or (5) file a motion for new trial. *See In re J.M.S.*, 43 S.W.3d 60, 62 (Tex. App.—Houston [1st Dist.] 2001, no pet.), *superceded on other grounds*, 2007 Tex. App. LEXIS 1727 (Tex. App.—Beaumont Mar. 8, 2007, no pet.); *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). To preserve a factual-sufficiency challenge for

13

appeal, a party must file a motion for new trial. *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003); *In re J.M.S.*, 43 S.W.3d at 62.

Further, in a parental termination case, a motion for new trial is timely only if it is filed within fifteen days after a final order is signed by the trial judge. *See* Tex. Fam. Code Ann. § 263.405(b)(1) (West 2008). An amended motion for new trial can typically preserve issues for appeal, but only if it is filed within thirty days after the final order is signed. Tex. R. Civ. P. 329b(b) (providing that "one or more amended motions for new trial may be filed . . . within thirty days after the judgment or other order complained of is signed"); *Moritz v. Preiss*, 121 S.W.3d 715, 721 (Tex. 2003) (stating that "an untimely amended motion for new trial does not preserve issues for appellate review, even if the trial court considers and denies the untimely motion within its plenary power period"). Finally, in a termination case, a party seeking an appeal must file a statement of points on which she intends to appeal within fifteen days of the trial court's judgment. Tex. Fam. Code Ann. § 263.405(b)(2).[5]

The record shows that Mason first raised the issue of evidence sufficiency in her amended motion for new trial, which was filed 47 days after the judgment in her case. However, we need not determine whether Mason preserved this issue for appellate review. Assuming without deciding that we may consider Mason's sufficiency claims, we conclude that there was sufficient evidence to support termination in her case. For the following reasons, we hold that the evidence

---

[5] This portion of the family code has been amended with an effective date of September 1, 2011. Because this appeal commenced before that time, the prior version of the statute is applicable. *See* Act of May 9, 2011, 82nd Leg., R.S., ch. 75, § 4, 2011 Tex. Gen. Laws 75 (West) (codified at Tex. Fam. Code Ann. § 263.405(b)).

was legally and factually sufficient to support a finding that statutory grounds for termination existed and that termination was in the best interests of Mason's children.

*Statutory grounds*

At trial, the jury was asked whether Mason's parental rights should be terminated pursuant to subsections (D) and (E) of section 161.001(1) of the family code, which support a termination order based on clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child [or] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1).

The jury, after being instructed that termination required clear and convincing evidence of at least one of these statutory grounds, found that Mason's parental rights should be terminated. *See id.* Only one ground is necessary to support a judgment in a parental rights termination case. *See id.* (requiring finding of one statutory ground to support termination order); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, when multiple grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent–child relationship should be terminated, we must uphold the jury's finding on any ground that supports it. *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied).

Both subsections (D) and (E) require proof of child endangerment, which is defined as exposing a child to loss or injury or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment does not have to

15

be established as an independent proposition, but can be inferred from parental misconduct alone. *Id.* It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury, *id.*, nor must the conduct occur in the presence of the child, *In re B.B.*, 971 S.W.2d 160, 166–69 (Tex. App.—Beaumont 1998, pet. denied). Conduct that subjects a child to a life of uncertainty and instability endangers the child's emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Subsection (D) requires a showing that the environment in which the child was placed endangered the child's physical or emotional well-being, while subsection (E) requires that the cause of the endangerment be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omissions or failures to act. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

To support its contention that Mason endangered her children under subsections (D) and (E), the Department presented evidence including the following:

a. Freeman's testimony that he saw video clips of Mason having sex while eight-month-old A.M. was awake in a swing in the same room and while L.M. was with Mason in the bed;[6]

b. Mason's own testimony admitting that she had sex in front of A.M. and "wasn't thinking at the time" about the effect on A.M. of doing so;

c. Licensed psychiatrist Dr. Michael Campbell's testimony that such exposure to sex "certainly couldn't be helpful" to an 8-month-old;

---

[6] Mason insists that no reasonable juror could find the testimony of Orvando Freeman credible. In support of this argument, she cites the Department's non-production of the most incriminating videos and the fact that Freeman never documented or testified as to his viewing of the videos prior to trial. However, the jury is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re J.L.*, 163 S.W.3d 79, 87 (Tex. 1996). Further, as we address below, the evidence that would remain if Freeman's testimony were excluded is sufficient to support termination.

d. Licensed psychiatrist Dr. Timothy Daheim's testimony that Mason admitted to making sex tapes in front of both children and that doing so could expose her children to pedophiles;

e. Mason's further testimony that Kennedy often locked himself in his room with L.M., where he might have been watching pornography with the two-year-old present, but she did not move L.M. and A.M. out of his household and in fact still left them alone with Kennedy occasionally;

f. Her therapist's testimony that Mason considered returning to Jeffrey with L.M. and A.M. even though she had accused Jeffrey of rape;

g. Further testimony from Dr. Campbell, who performed a psychological evaluation of Mason, that she:

   i. Suffered from Bipolar Disorder and Borderline Personality Disorder and had impaired judgment and insight,

   ii. Subjected L.M. and A.M. to a risk of abuse and neglect,

   iii. Needed five to ten years of intensive weekly therapy, even after which her parenting might not improve, and

   iv. Allowed the girls to live with Kennedy, whom Campbell described as so selfish and narcissistic that he should not be alone with children;

h. The testimony of Breanna Bearden, who supervised Mason's visits with L.M., that even while receiving parenting classes Mason manipulated L.M. with toys, disciplined L.M. inappropriately, and overlooked a smelly diaper that L.M. wore for an entire visit; and

i. Testimony from L.M.'s guardian ad litem that after leaving Mason's home, L.M. engaged in sexualized behavior that indicated she had participated in or observed sexual conduct.

Particularly based on Mason's own testimony about leaving L.M. and A.M. with Kennedy despite his troubling behavior, a reasonable factfinder could have formed a firm belief or conviction that Mason knowingly placed or allowed the children to remain in conditions that endangered their

17

physical or emotional well-being. *See In re J.F.C.*, 96 S.W.3d at 266. Only one statutory ground is needed to support termination. *See In re A.V.*, 113 S.W.3d at 362. We nevertheless note that, given the testimony that Mason had sex while her children were in the room and was unable to comprehend the seriousness of this behavior, a reasonable jury could also have formed a firm conviction that she engaged in conduct that endangered their physical or emotional well-being. *Id.* Considering all of the evidence in the light most favorable to the jury's finding and assuming that the jury resolved disputed facts in favor of that finding, we conclude that the above evidence is legally sufficient to support the termination of Mason's parental rights under either subsection (D) or (E).

Likewise, viewing the evidence in a neutral light, we determine that a reasonable jury could have formed a firm belief or conviction that Mason placed or knowingly allowed her children to remain in conditions that endangered them or engaged in conduct or knowingly placed them with persons who engaged in conduct that endangered them. We therefore conclude that the evidence is factually sufficient to support either statutory ground for termination.

*Children's best interests*

In a parental rights termination case, the best interests of the children are assessed using a non-exhaustive list of factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the children's wishes, (2) their emotional and physical needs now and in the future, (3) emotional or physical danger to the children now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the children by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's

18

acts or omissions indicating that the parent-child relationship may be improper, and (9) any excuses for the parent's conduct. *Id.* at 372.

The Department need not prove all nine *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, the analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interests of the children. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).

Mason claims that her desire and commitment to reunite with her children and the lack of assistance or guidance she received from the Department indicate that there is no reasonable basis for a finding that termination was in her children's best interests. The Department responds that numerous factors, including the children's attachment to their foster family rather than Mason, the instability in her life compared with the stability offered by the foster family, and the deficiencies in Mason's parenting abilities, support the jury's finding.

We agree with the Department. The evidence indicates that several of the *Holley* factors support termination in this case. For example:

a. The fact that L.M. and A.M. call the Rushings "Mommy" and "Daddy" and appear more attached to them than to Mason suggests that the children do not wish to return to Mason.

b. The testimony of several witnesses indicates that the stability of adoption rather than prolonged foster care would best serve the children's emotional and physical needs now and in the future.

19

c. The evidence that Mason left A.M. and L.M. alone with Kennedy despite his dangerous personality and behavior and considered returning with them to her alleged rapist indicates that returning the children to her could result in emotional or physical danger to the children now and in the future.

d. The testimony that Mason disciplined L.M. inappropriately and used her visits with A.M. to nap, in comparison with Rushing's description of the girls' "wonderful" new family life and L.M.'s recovery from developmental delay, suggests that the parties' relative parenting abilities favor termination.

e. Considerable evidence of Mason's conduct, including her misunderstanding of L.M.'s development, her halfhearted attempts to find work, her admission that she had sex in front of A.M., and the fact that she left L.M. and A.M. with Kennedy, indicate that the parent-child relationship was improper.

Considering this evidence in the light most favorable to the jury's finding, we conclude that the evidence was legally sufficient to support a finding that termination was in the best interests of Mason's children. Because the jury could have resolved all disputed facts in favor of the Department and formed a firm belief or conviction that termination was in the children's best interests, we also hold that the evidence was factually sufficient to support the jury's finding.

Having reviewed the entire record, we conclude that the evidence in Mason's case was legally and factually sufficient to support the termination of her parental rights to L.M. and A.M. We overrule her third, fourth, and fifth issues on appeal.

**Spoliation of evidence**

In her first issue on appeal, Mason complains that the trial court erred in refusing to issue a jury instruction on spoliation of the missing webcam videos that allegedly showed her engaging in sexual acts in front of her children.

In Texas, a party may not subvert the discovery process and the fair administration of justice simply by destroying evidence of an adverse claim. *Trevino v. Ortega*, 969 S.W.2d 950, 955 (Tex. 1998) (J. Baker, concurring); *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 666 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Thus, once a party has notice of a potential legal claim, that party has a duty to exercise reasonable care to preserve information relevant to that claim. *Trevino*, 969 S.W.2d at 957. When a party believes the other party has improperly destroyed or discarded relevant evidence, it may move for sanctions or request a spoliation instruction. *Offshore Pipelines, Inc.*, 984 S.W.2d at 666.

A spoliation instruction tells the jury that, if a party has control over a piece of evidence and fails to retain or produce it, the jury should presume that the evidence would have been unfavorable to the party who controlled it. *Wal-Mart Stores, Inc.*, 106 S.W.3d at 721–22; *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 199 (Tex. App.—Austin 2005, pet. denied). A spoliation instruction is proper when a party has deliberately destroyed evidence or has failed either to produce relevant evidence or to explain its nonproduction. *Wal-Mart*, 106 S.W.3d at 721–22. To determine whether such an instruction is justified, a trial court must consider (1) whether the party accused of spoliation had a duty to preserve the evidence; (2) whether that party negligently or intentionally spoliated evidence; and (3) whether the spoliation prejudiced the other party's ability to present its case or defense. *Offshore Pipelines, Inc.*, 984 S.W.2d at 666 (citing *Trevino*, 969 S.W.2d at 954–55).

According to Mason, the Department's production of only seven or eight webcam videos out of the fifteen to twenty it allegedly received is a clear case of spoliation. Mason claims

21

there is no question that the Department anticipated litigation involving Mason given its ongoing investigation of her family. Consequently, she states, the Department had a duty to preserve evidence of her alleged sexual conduct in front of her children that came into its control. By failing to produce some of the videos, Mason claims, the Department breached that duty. Mason also argues that testimony such as Freeman's statement that he "do[esn't] know what happened to the videos" represents a failure by the Department to explain the videos' absence.

Finally, Mason claims that she could not adequately present her defense without the missing videos. She claims the videos were crucial to the Department's case that she engaged in sex acts in the presence of her older child and were not cumulative of other evidence at trial. She adds that the Department's failure to produce the videos presented Mason with the "untenable proposition" of "having to negate the existence of a damning video which was never produced, despite sworn testimony that one employee of the department had personally viewed it in his office." Therefore, Mason concludes, a spoliation instruction was proper and the trial court erred in refusing to issue one.

The Department responds that Mason's claim should be overruled, primarily because she did not preserve it for appeal. The Department states that Mason did not provide the trial court with a "substantially correct written instruction" or even an oral instruction on spoliation at the charge conference, nor did she mention spoliation in her statement of points on appeal. Since both are required for preservation in family cases, the Department argues, Mason's spoliation issue is precluded from appellate review. *See* Tex. Fam. Code Ann. § 263.405(b); Tex. R. Civ. P. 278; *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 585 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

22

However, the Department also states that if Mason's claims are considered, they should be overruled because she cannot show harm from the denial of a spoliation instruction. The Department argues that, because the jury heard so much about Mason's deficient parenting apart from the conduct allegedly shown on the missing videos, any error by the court in denying the instruction would be harmless.

First, we address the Department's contention that Mason failed to preserve her spoliation issue on appeal. In general, under the Texas Rules of Civil Procedure, a trial court's failure to submit a definition or instruction to the jury "shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." Tex. R. Civ. P. 278. In addition, the Texas Family Code requires that "[n]ot later than the 15th day after the date a final order is signed by the trial judge, a party who intends to . . . appeal the order must file with the trial court . . . a statement of the point or points on which the party intends to appeal." Tex. Fam. Code Ann. § 263.405(b).

Although Mason made objections on the basis of spoliation throughout her trial, she did not submit a proposed jury instruction either orally or in writing at the charge conference. In addition, in her statement of points filed on February 10, 2011, Mason does not specifically mention a spoliation instruction but does complain of "harmful error in allowing testimonial evidence regarding the content of video, when the videos about which the witness testified were never produced, despite proper discovery request by Respondent and a Court order for the production of the video." However, we need not decide whether these measures were sufficient to preserve Mason's spoliation-instruction issue on appeal. Assuming without deciding that we may consider

23

Mason's claim, we conclude that even if the trial court erred in denying the spoliation instruction, Mason cannot demonstrate harm from the denial.

If a trial court errs in omitting a jury instruction, its judgment can only be reversed on appeal if the omission probably resulted in the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). Even if the trial court erred in denying a spoliation instruction, the evidence in favor of terminating Mason's parental rights was considerable. It included the testimony as to L.M.'s disturbed and sexualized behaviors after her removal from Mason's home, which her guardian ad litem believed were an indication that L.M. had witnessed or participated in sexual activity. It further included Dr. Daheim's testimony that Mason admitted to having sex in front of her children. There was also Mason's admission on the stand that she did have sex in the presence of A.M. and "wasn't thinking at the time" about the effect on A.M. of doing so. Finally, the jury heard evidence that Mason considered returning to Jeffrey with her children despite having accused him of rape and that she continued leaving the children with Kennedy despite his behavior.

Such evidence, which the jury would have considered even if it received an instruction that the missing videos did not favor the Department's case, would support a finding that Mason endangered her children and that termination is in their best interests. Mason therefore cannot show that the omission of a spoliation instruction probably resulted in an improper judgment. *See Shupe*, 192 S.W.3d at 579. We overrule her first issue on appeal.

**Admission of video evidence**

In her second issue, Mason complains that the trial court erred in admitting the webcam videos that were still in the Department's possession at the time of trial. The admitted

videos showed Mason and Stanton recording their sexual activity by webcam, but did not show any children in the room at the time. Mason contends that the trial court's decision to admit the videos was an abuse of discretion because they were unauthenticated, irrelevant, and more prejudicial than probative. The Department responds that, because other evidence supported termination and the videos were cumulative of testimony presented at trial, Mason cannot show harm from the videos' admission.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Tex. R. Evid. 401. In a termination proceeding, any evidence that makes it more or less likely that a parent endangered her children's physical or emotional well-being or that relates to the children's best interests is relevant. *See* Tex. Fam. Code Ann. § 161.001. Relevant evidence should nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *In re K.Y.*, 273 S.W.3d 703, 710 (Tex. App.—Houston [14th Dist.] 2008, no pet.). To exclude evidence under Rule 403 "'is an extraordinary remedy that must be used sparingly.'" *Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ) (quoting *LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 698 (Tex. App.—Dallas 1992, writ denied)).

In the present case, the sex tapes Mason recorded might be considered probative of her poor judgment and lack of boundaries, which the Department's witnesses suggested were harmful to Mason's children and contributed to her inability to protect and nurture them. However,

25

we need not determine if the sex tapes were authenticated, relevant, and more probative than prejudicial. We conclude that, even if the trial court erred in admitting the videos, Mason fails to prove that the admission was harmful.

Even if evidence is improperly admitted, reversal is only warranted if the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). "Reversible error does not usually occur in connection with evidentiary rulings unless appellant demonstrates that the whole case turns on the particular evidence excluded or admitted." *Dudley v. Humana Hosp. Corp.*, 817 S.W.2d 124, 126 (Tex. App.—Houston [14th Dist.] 1991, no writ).

As previously discussed, the jury heard an array of evidence supporting termination. For instance, there was evidence that Mason was unstable, had mental health issues, was willing to expose L.M. and A.M. to men who endangered them, and disciplined L.M. inappropriately. There was also evidence that L.M. engaged in disturbed and sexualized behaviors, suggesting that she had witnessed sexual activity, and that a more stable adoptive home awaited L.M. and A.M. if Mason's rights were terminated. Moreover, Mason testified in response to detailed questions about the videos in the Department's possession. She admitted that she was "having actual sex" in the videos, that there was no attempt to hide her and Stanton's bodies, and that there were "very close-up pictures" of her and Stanton's genitals. The actual videos were essentially cumulative of this testimony. *See State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 881 (Tex. 2008) (quoting *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989) ("The erroneous admission of testimony that is merely cumulative of properly admitted testimony is harmless error.")).

26

Given such evidence, Mason has clearly failed to demonstrate that "the whole case turns" on the webcam videos. We cannot conclude that their admission probably caused an improper judgment. *See Bay Area Healthcare Grp., Ltd.*, 239 S.W.3d at 234; *Dudley*, 817 S.W.2d at 126. We therefore overrule Mason's third issue on appeal.

## CONCLUSION

Having found no error, we affirm the trial court's decree of termination.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed: May 17, 2012